# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MR. NIMA PAHLAVAN, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-1715 |
| | : | |
| DREXEL UNIVERSITY COLLEGE OF MEDICINE, | : | |
| *Defendant*. | : | |

**Goldberg, J.**                                               **February 10, 2020**

## MEMORANDUM OPINION

The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*., prohibits exclusion from academic programs based upon a person's disability. The Act's protections include programs such as the one at issue here—a doctorate degree from Drexel University College of Medicine. But, in some instances, even where the disabled student exhibits extraordinary tenacity in overcoming disabilities, an academic institution may legally reach the difficult determination that such person is not qualified to complete the program, even with reasonable accommodations.

Here, I find that Drexel made such a decision and dismissed Plaintiff from its medical school program, and did so without violating the Americans with Disabilities Act. The undisputed evidence before me compels the finding that, even with the reasonable accommodations that were afforded, Plaintiff was not otherwise qualified to complete Drexel's program.[1]

---

[1] Resolution of this matter necessarily required a review of records and evaluations undertaken by Plaintiff's mental health professionals regarding his mental health diagnoses and treatments. While Plaintiff disclosed his mental health diagnoses in prior, public pleadings, I

1

# I. BACKGROUND AND STATEMENT OF FACTS

Plaintiff, Nima Pahlavan, has sued Defendant, Drexel University College of Medicine ("Drexel") for discrimination, under the Americans with Disabilities Act of 1990 (Count One), Section 504 of the Rehabilitation Act of 1972 (Count Two), and for breach of contract (Count Three). Plaintiff alleges that Drexel failed to accommodate his disabilities and then dismissed him from the medical school program.

Presently before me is Drexel's Motion for Summary Judgment on Counts One and Two (ECF No. 79) and Drexel's "Motion in Limine to Limit the Testimony of Lisa Meeks, Ph.D. to Her Report" (ECF No. 80). For the foregoing reasons, I find that there is no genuine dispute as to any material fact and will grant Drexel's Motion for Summary Judgment and decline to extend supplemental jurisdiction over Plaintiff's remaining breach of contract claim. Based on my findings below, I need not reach the merits of Drexel's Motion in Limine, and will, therefore, deny that motion as moot.

## A. General Overview – Plaintiff's Participation in Drexel's Medical School Program

The following facts are taken from the parties' Statements of Facts ("SOF") together with the exhibits of record. Unless otherwise indicated, these facts are undisputed.

Plaintiff's journey through Drexel's medical school program had many phases, all of which

---

permitted the parties to submit their summary judgment briefs under seal and in redacted form to protect Plaintiff's sensitive and confidential mental health records. (Order, ECF No. 78, June 29, 2018.) Pursuant to In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., 924 F.3d 662 (3d Cir. 2019), there is a "presumptive right of public access" to pretrial motions and the materials filed in connection therewith. Id. at 672. The presumption of access may be rebutted by a showing that "the interest in secrecy outweighs the presumption" and that "disclosure will work a clearly defined and serious injury to the party seeking closure." Id. In light of these standards, and upon consideration of Plaintiff's request to redact certain portions of the present Opinion, I find that good cause exists to redact certain excerpts herein that reflect communications with and impressions by Plaintiff's therapists.

I have carefully reviewed in resolving this motion. I start with a general summary of the facts leading up to Plaintiff's dismissal from that program.

The first two years of Drexel's program are referred to as the "didactic" or non-clinical years, consisting primarily of academic classroom work. (Pl.'s SOF ¶ 3, ECF No. 96.) The final two years of the program consist primarily of clinical rotations.[2] (Id.)

During his first semester, Plaintiff requested and received accommodations based on his documented disability of Attention Deficit Hyperactivity Disorder ("ADHD"). (Def.'s SOF ¶ 22, ECF No. 79-2.) During the remainder of his tenure in the program, Plaintiff requested and received additional accommodations, both formally through Drexel's University's Office of Disability Resources ("ODR") and informally through the medical school.

As will be detailed herein, during his third-year clinical rotations, Plaintiff received three failing grades. (Id. ¶¶ 4(d)(iii)–(iv).) In response, Drexel's Clinical Promotions Committee (the "Committee")—which oversees the academic progress of students and addresses situations in which students are not making satisfactory progress—reviewed Plaintiff's overall academic performance. (Id. ¶ 4(e).) In February 2012, that Committee decided to dismiss Plaintiff from the program. (Id.) Plaintiff appealed this dismissal and, thereafter, the Committee (on behalf of Drexel) overturned the dismissal and granted Plaintiff a one-year leave of absence. (Id. ¶ 4(g).)

Upon his return, Plaintiff received additional accommodations and repeated all third-year clinicals during the fall semester of 2013. (Id. ¶¶ 4(h)–(j), and 26.) Before doing so, Plaintiff agreed to and was subject to a Conditional Enrollment Agreement, which specified that any subsequent less-than-Satisfactory grade would be grounds for his dismissal. (Id. ¶ (k).)

---

[2]     The parties also refer to the clinical rotations as clerkships. For the sake of clarity, I will refer to them as "clinicals" or "clinical rotations."

Plaintiff then repeated certain clinicals but failed his rotation in Internal Medicine and unsuccessfully appealed this grade. (Id. ¶¶ 5, 40.) While his appeal was pending, Plaintiff received a Marginal Unsatisfactory grade in the Obstetrics/Gynecology rotation because he failed the shelf examination.[3] (Id. ¶ 4(m).) In April 2014, the Clinical Promotions Committee again reviewed Plaintiff's academic performance and, on behalf of Drexel, decided to dismiss him as a medical student based on his violation of his Conditional Enrollment Agreement. (Id. ¶ 6.)

Plaintiff appealed his dismissal. In July 2014, Drexel upheld the decision of the Clinical Promotions Committee and dismissed Plaintiff from the medical school program. (Id. ¶ 8.)

**B. Drexel's Medical School Program Requirements**

Drexel's Medical Student Handbook (the "Handbook") sets forth, in part, the program's academic requirements. As it relates to clinicals, the Handbook's "Guidelines for Promotion: From Year 3 to Year 4" mandate that:

> All students must successfully complete all required clerkship rotations in order to be promoted from Year 3 to Year 4. Each Clerkship Department will establish criteria which must be successfully completed in order to pass a given Department Clerkship. Departments establish clinical competency requirements which must be successfully met in order to successfully complete a departmental clerkship. . . .

(Id. ¶ 2.)

Regarding the review process when unsatisfactory grades are received, the Handbook states:

> Students earning grades of Marginal Unsatisfactory and/or Unsatisfactory in one or more clerkships will have their entire academic record reviewed by the Clinical Promotions Committee. The Clinical Promotions Committee may consider repeated failure as grounds for dismissal from the College of Medicine. The Clinical Promotions Committee may also recommend academic sanctions such as suspending clinical work pending successful completion of academic requirements

---

[3]     Shelf examinations are standardized subject area tests, developed by the National Board of Medical Examiners ("NBME"), given to third-year medical students after clinical rotations to assess the students' knowledge of the clinical's subject matter.

(e.g., NBME subject examinations), repeating clerkships, repeating the entire academic year, or other sanctions deemed appropriate.

(Id.)

Drexel's "M.D. Program Technical Standards" set forth the prerequisites for progression through and graduation from its medical school program. (Id. ¶ 3.) The Technical Standards define the fundamental attributes that a candidate for a medical degree must possess and include the following:

The candidate must be able to measure, calculate, reason, analyze, integrate and synthesize. In addition, the candidate must be able to comprehend three-dimensional relationships and to understand the spatial relationships of structures. Problem solving, the critical skill demanded of physicians, requires all of these intellectual abilities. The candidate must be able to perform these problem-solving skills in a timely fashion.

(Id.)

## C. **The Didactic, Non-Clinical Years** – Academic Years 2008–2010

Plaintiff began Drexel's medical school program in the fall of Academic Year ("AY") 2008 for his didactic, non-clinical years. (Id. ¶ 1.) In December 2008, Plaintiff contacted Drexel's ODR, which is available for students who require accommodations for physical or mental disabilities. (Id. ¶ 22.) Plaintiff requested and received time-and-a-half on examinations based on his documented disability of ADHD. (Id.) He was also provided with software to assist him with reading. (Pl.'s SOF ¶ 3.) [4]

---

[4]     Plaintiff claims that this office had inadequate records, insufficient documentation, was incompetent, and lacked any staff specialized in working with clinical programs. (Pl.'s Resp. to Def.'s SOF ¶¶ 22-24 (citing Ex. O, Dep. of Lisa Meeks, Ph.D. ("Meeks Dep.") 66, 68-69).) Drexel responds that Plaintiff never appealed any decision of the ODR, nor did he complain to the ODR that he experienced difficulty using any accommodation. (Def.'s SOF ¶ 25.) Plaintiff counters that, as directed by the ODR, he made specific requests for clinical accommodations to various Drexel administrators, including Drexel's Dean, Dr. Amy Fuchs, with whom Plaintiff lodged requests following his one-year leave of absence. (Pl.'s Resp. to Def.'s SOF ¶ 25.) It remains undisputed, however, that after this leave of absence, Plaintiff was granted accommodations for

During AY 2008–2009, Drexel provided Plaintiff with a referral to psychiatrist Dr. Gottlieb for prescriptions related to his ADHD, medical monitoring, and psychotherapy. (Def.'s SOF ¶ 29, Ex. F, Dep. of Nima Pahlavan ("Pahlavan Dep.") 53:8–54:17.) In June 2010, Dr. Gottlieb also diagnosed Plaintiff with Generalized Anxiety Disorder. (Pl.'s SOF ¶ 9.) Dr. Gottlieb continued to provide therapy for Plaintiff beginning in February 2009 through 2014, when he was dismissed from the program. (Id.) Plaintiff contends that, because Dr. Gottlieb provides services to all students, Dr. Gottlieb was provided to him for treatment but not as an accommodation for his disabilities. (Pl.'s Supp. Resp. to Def.'s SOF ¶ 27, ECF No. 105.)

In June 2009, Drexel's Preclinical Promotions Committee reviewed Plaintiff's academic progress and wrote to Plaintiff regarding two courses, Neuroscience and Gross Anatomy, in which he received grades of Unsatisfactory and Marginal Unsatisfactory. (Def.'s SOF ¶ 4(a), Ex. 8 at 8a.) Plaintiff remediated both grades to a Satisfactory score through a subsequent course or re-examination. (Def.'s SOF ¶ 4(a).)

In October 2009, Drexel's Preclinical Promotions Committee reviewed Plaintiff's academic progress and wrote to Plaintiff regarding three courses in which he currently had grades below 70, including Introduction to Clinical Medicine, Community and Preventive Medicine, and Pathology. (Id. ¶ 4(b).) In that letter, Drexel encouraged Plaintiff to avail himself of the school's academic and personal support services to reduce the pressure and course-load of his second year. (Id.) In addition to the availability of free tutors, Drexel offered Plaintiff the option of utilizing an Extended Curriculum for his second-year coursework, which would decrease his academic load and spread the coursework over two years. (Id.)

---

extended time on tests, books on CDs and in PDF format, and clinical rotations within the Philadelphia area. (Def.'s SOF ¶ 26.)

Drexel again wrote to Plaintiff in November 2009, advising that his grades in the three courses mentioned above and an additional course, Psychopathology, remained at below 70. (Ex. 8 at 8c;[5] Pahlavan Dep. 103:18–104:10.) Drexel reminded Plaintiff to utilize the school's academic and personal support services. (Ex. 8 at 8c.) Plaintiff declined the option to proceed with an Extended Curriculum. (Pahlavan Dep. 103:15–103:16.)

Plaintiff remediated his performance in Introduction to Clinical Medicine to a score of Satisfactory by subsequent examination.[6] (Def.'s SOF ¶ 4(a).) For the remaining courses of Community and Preventive Medicine, Pathology, and Psychopathology, Drexel's records reflect that Plaintiff eventually passed each with a score of Highly Satisfactory and two scores of Satisfactory, respectively. (Ex. 6.)

Before starting his third-year clinical rotations in AY 2010–2011, Plaintiff took an extended period of time to study for the United States Medical Licensing Examination, Step 1, which is a national examination that all Drexel students must pass before beginning rotations in their third year. (Def.'s SOF ¶ 4(c).) Plaintiff passed this exam. (Ex. 6.)

**D. The Clinical Rotations – Academic Years 2010–2012**

Plaintiff began his clinical rotations in AY 2010–2011 and passed his first rotation in Psychiatry. (Ex. 6.) In his next rotation, he first received an Unsatisfactory grade in Pediatrics for failing to demonstrate clinical competence and for failing the shelf examination. (Def.'s SOF ¶

---

[5] Unless otherwise indicated, the exhibits referenced as "Ex." refer to those accompanying Drexel's SOF at ECF No. 79-2.

[6] Drexel's records of Plaintiff's academic performance reflect that his grade in an additional course, Pharmacology, was also Marginal Unsatisfactory, but Plaintiff later remediated his performance to a passing score by re-examination. (Def.'s SOF ¶ 4(a).) The letters from Drexel's Clinical Promotions Committee relative to other failing courses, however, do not mention this Pharmacology grade. (Ex. 8 at 8a–8c.)

4(d)(i).) Drexel then provided Plaintiff with four weeks of a one-on-one tutor, who worked with Plaintiff on patient history notations and physical examination skills. (Id. ¶ 4(d)(ii); see also Pl.'s Resp. to Def.'s SOF 4(a)–(c), ECF No. 97.) Although Plaintiff stated that the tutor was helpful in providing him with a template for notetaking and presenting, Plaintiff claimed that there was a lack of access or consistency in meeting with the tutor. (Pahlavan Dep. 72:24–73:9.)

Plaintiff next passed his Family Medicine clinical rotation. (Ex. 6.) When he later repeated the Pediatrics rotation, he received a Marginal Unsatisfactory grade due to failing the shelf examination. (Def.'s SOF ¶ 4(d)(iii).) Plaintiff also received a Marginal Unsatisfactory grade in his Surgery rotation due to failing the shelf examination, and an Unsatisfactory grade in his Internal Medicine rotation for failing to demonstrate clinical competence and for failing the shelf examination. (Id. ¶ 4(d)(iv)–(v).)

Thereafter, in AY 2011–2012, Dr. Gottlieb referred Plaintiff to psychologist, Dr. Swirsky-Sacchetti, to conduct a neuropsychological evaluation focusing on Plaintiff's organizational and comprehension issues and to provide recommendations that could aid in Plaintiff's ability to remain in the medical school. (Ex. 12 at DUCOM-NP 0200–08.) Under Dr. Swirsky-Sacchetti's supervision, Plaintiff was first evaluated in August 2011, and again on three subsequent occasions, ending in March 2012. After those evaluations, Dr. Swirsky-Sacchetti submitted a neuropsychological evaluation report of his findings. (Ex. L, Dep. of Thomas Swirsky-Sacchetti, Ph.D. ("Swirsky-Sacchetti Dep.") 10:6–11:1; see also Ex 12.)

███████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 12 at

DUCOM-NP 0207.) ██████████████████████████████████

███████████████████████████████████████████████████

8

██████████████████████ (Id.) ██████████████████████████

████████████████████████████████████████████████████████

███ (Id.) ████████████████████████████████████████████████

████████████████████████████████████████ (Id. at 207-08.) After this

evaluation, Plaintiff later returned to Dr. Swirsky-Sacchetti for therapy, beginning around November 2012. (Swirsky-Sacchetti Dep. 31:17–33:6.)

In February 2012, Drexel's Clinical Promotions Committee met to review and discuss Plaintiff's academic performance. (Def.'s SOF ¶ 4(e).) In a February 13, 2012 letter, the Promotions Committee informed Plaintiff that, based upon his multiple Unsatisfactory and Marginal Unsatisfactory clinical grades, the Committee, on behalf of Drexel, decided to dismiss him from the College of Medicine. (Ex. 8 at 8d.)

Plaintiff appealed this dismissal and requested a one-year medical leave of absence to work with his therapists, Dr. Gottlieb and Dr. Swirsky-Sacchetti, in order to develop skills in organization, address his anxiety, and work on sleep issues, all of which he contended accounted for his lack of success. (Def.'s SOF ¶ 4(f).) On May 15, 2012, the Clinical Promotions Committee granted Plaintiff's request and reversed the dismissal. (Id. ¶ 4(g).) The Committee, on behalf of Drexel, specified that Plaintiff's leave of absence was conditioned upon his participation in intensive counseling, after which he could return to the program and repeat all third-year clinical rotations, subject to dismissal if he received a less-than-Satisfactory grade in any subsequent rotation. (Id.)

### E. The Leave of Absence – Academic Year 2012–2013

During AY 2012–2013, Plaintiff took a one-year, medical leave of absence. (Id. ¶ 4(h).) Before returning to Drexel for AY 2013–2014, Drexel's Student Affairs Office and Clinical

Promotions Committee arranged for Plaintiff to complete a one-on-one clinical skills refresher course with Dr. Dennis Novack, Drexel's Associate Dean for Medical Education. (Id. ¶ 4(j).) Dr. Novack found that Plaintiff did well in the clinical refresher. (Pl.'s Resp. to Def.'s SOF ¶ 4(j), Ex. H, Dep. of Amy Fuchs, M.D. ("Fuchs Dep.") 61:6–10.)

In addition, before beginning his repeated clinical rotations in AY 2013–2014, Plaintiff passed a "fitness for duty" evaluation with Dr. Eileen Bazelon, a Drexel faculty member. (Def.'s SOF ¶ 4(i).) In preparing her written evaluation, dated June 11, 2013, Dr. Bazelon spoke with Dr. Swirsky-Sacchetti about his treatment of Plaintiff. (Pl.'s Resp. Br. 14, ECF No. 95; Swirsky-Sacchetti Dep. 94:10–95:7.) While Dr. Bazelon expressed doubt about Plaintiff's ability to succeed in the medical program, she cleared him to return, stating:

> Because I have/had grave reservations about Mr. Pahlavan's ability to succeed in medical school, I decided to confront him . . . with my concerns. I told him bluntly that I was very worried that he did not understand what a doctor is, or does, and that perhaps he confused medicine with social work . . . I reflected that he is quite indecisive and that that trait is inimical to success either as a medical student or a doctor. I advised him to leave school and seek another career because I am worried that he could not make the transition from student to decision maker. . . .

> Because of the possibility that Mr. Pahlavan can do things differently, I am recommending that he be given a chance to repeat the third year. I am not at all sure that he can succeed; given his shaky knowledge base, his slow reading rate, his characterologic flaws, I think his chances are not good, but I think the medical school could consider giving him that final opportunity to prove whether or not he can do things differently.

(Def.'s SOF ¶ 4(i).)

In June or July 2013, Dr. Amy Fuchs, Drexel's Senior Associate for Student Affairs, met with Dr. Gottlieb and joined a call with Dr. Swirsky-Sacchetti. (Pl.'s Resp. to Def.'s SOF ¶ 30.) The purpose of the call was to notify Dr. Fuchs of the accommodations that Dr. Swirsky-Sacchetti was recommending to help Plaintiff "prepare for and be on" his third- and fourth-year clinical rotations. (Ex. G, Dep. of Diane Gottlieb, M.D. ("Gottlieb Dep.") 146:22–147:7; Swirsky-

Sacchetti Dep. 91:13–93:7.) These accommodations included, first, a template for presenting, and second, a one-on-one mentor. (Gottlieb Dep. 146:4–147:7; Swirsky-Sacchetti Dep. 89:6–93:7.) At her deposition, Dr. Gottlieb noted that these accommodations had already been provided to Plaintiff through a fourth-year medical student, who worked with Plaintiff as a one-on-one mentor and provided Plaintiff with a template for presenting. (Gottlieb Dep. 149:7–151:7.)

Plaintiff also revisited Drexel University's ODR and, along with the assistance and recommendation of Dr. Swirsky-Sacchetti, was approved for the following accommodations: (1) extended time for examinations from his already-increased one and half time to two times typical testing time; (2) books and materials on CD or in accessible PDF format; and (3) third-year clinicals scheduled in the Philadelphia area, so that Plaintiff could continue psychiatric and psychological treatment. (Def.'s SOF ¶ 26.)[7]

Finally, before Plaintiff resumed the program, Dr. Fuchs reiterated to Plaintiff the conditions of his return as outlined in the "Conditional Enrollment Agreement," which specified that any subsequent less-than-Satisfactory grade would be grounds for his dismissal. (Def.'s SOF ¶ 4(k).)

---

[7]     The parties dispute whether Drexel ever provided Plaintiff with books and materials on CD or in an accessible PDF format. (Compare ODR's Notice of Accommodation, Ex. 12 at DUCOM-NP 188 (Drexel's ODR records indicating that these accommodations were approved), with Pahlavan Dep. 136:3–9, 143:20–144:5 (Plaintiff testifying that Drexel did not provide him with these materials).) Plaintiff also contends that there is a factual dispute as to whether the ODR served as a method of accommodation for medical students with disabilities in clinical programs. (Pl.'s Resp. to Def.'s SOF ¶ 26.) Nonetheless, because Plaintiff does not aver that this particular accommodation would have enabled him to succeed in the medical school program, I find this dispute immaterial.

### F.  Repeat of the Clinical Rotations – Academic Year 2013–2014

During the fall semester of AY 2013–2014, Plaintiff resumed the program by repeating his third-year clinical rotations.  First, he repeated and passed his Surgery rotation.  (Id. ¶ 4(l).)  Thereafter, he repeated his Internal Medicine rotation, but again received an Unsatisfactory grade due to his failure to demonstrate clinical competence in either of his two, four-week inpatient rotations, one at Hahnemann University Hospital and one at Einstein Medical Center.  (Id. ¶ 4(l).)

Dr. David Wheeler, who was a resident physician and worked closely with Plaintiff during his time at Einstein Medical Center, described Plaintiff's difficulty with organizing his thoughts and integrating information as follows:

> And [Plaintiff] had no problem with that reporting stage.  He was able to talk to a patient and collect the history and do a basic physical exam.  But as soon as he started trying to formulate his own assessments, not just copying it from someone else, he really struggled, and he just wasn't able to take that information he had and synthesize what disease they have and then understanding that disease to provide treatment. . . .
>
> He did get better.  I mean, we worked a lot, like, every day, and I do think he got better over the course of the rotation, but I would argue that at the end of the rotation, he wasn't where most [third-year medical students] start.

(Id. ¶ 14, Ex. C, Dep. of David S. Wheeler ("Wheeler Dep.") 32:23–33:18.)

Plaintiff appealed his Unsatisfactory grade in Internal Medicine.  While his appeal was pending, Plaintiff passed his Family Medicine rotation, but received a Marginal Unsatisfactory grade in the Obstetrics/Gynecology rotation because he failed the shelf examination.  (Def.'s SOF ¶ 4(m).)

### G.  Plaintiff's Appeal of His Internal Medicine Grade

In February 2014, Plaintiff appealed his Internal Medicine grade, first, to Drexel's Clerkship Director, Dr. Janet Fitzpatrick, who oversaw the education of third-year medical

students during their rotation in Internal Medicine and served as the Chair of the third- and fourth-year Clinical Promotions Committee.  (Id. ¶¶ 5, 15.)

After considering Plaintiff's written appeal submission, meeting with Plaintiff, and speaking with each of Plaintiff's Internal Medicine evaluators, Dr. Fitzpatrick denied Plaintiff's appeal on the Internal Medicine grade.  (Id. ¶¶ 5, 13.)  Dr. Fitzpatrick identified recurring comments and themes in Plaintiff's 2011 and 2013 Internal Medicine evaluations, involving Plaintiff's difficulty with documentation, lack of organization, difficulty prioritizing patients' problems, difficulty with clinical reasoning, and professionalism issues.  (Id. ¶ 17.)

Dr. Fitzpatrick emphasized that clinical reasoning is a critical component to practicing medicine, as doctors must gather data from patients, analyze and interpret this data, and efficiently develop comprehensive and logical management plans using sound medical knowledge.  (Id. ¶ 18, Ex. E, Declaration of Janet H. Fitzpatrick, M.D. ("Fitzpatrick Decl.") ¶ 8.)  Dr. Fitzpatrick noted that, despite Plaintiff's hard work and Drexel's faculty's daily feedback and suggestions for improvement, Plaintiff was "an extreme outlier" in terms of his lack of clinical reasoning capability, namely his inability to communicate in an organized, understandable manner.  (Def.'s SOF ¶ 19, Fitzpatrick Decl. ¶ 10.)

Plaintiff claims that, in evaluating the appeal of the Internal Medicine grade, Dr. Fitzpatrick did not consider Plaintiff's disabilities or accommodations.  (Pl.'s Resp. Br. 18–19.)  Although it is not entirely clear, Drexel appears to concede this point.  In its reply brief, Drexel states that: "Mr. Pahlavan neglects to mention that in each instance he wrote appeal letters [to Drs. Fitzpatrick, Reynolds, and Moran] focusing on various and sundry issues *but did not even mention* his disability or the accommodations he received or did not receive. . . . [Drexel]'s faculty cannot be

held responsible for considering in internal appeals only the issues that Mr. Pahlavan actually raised." (Def.'s Reply 8, ECF No. 99 (emphasis in original).)

However, Dr. Fitzpatrick's declaration tells a different story and seems to suggest that Dr. Fitzpatrick did, in fact, consider Plaintiff's accommodations: Dr. Fitzpatrick stated:

> I am aware that Mr. Pahlavan claims that he requested various types of help while on the Internal Medicine rotations and did not receive it. It was my understanding that it was necessary for him to stay in the Philadelphia area for rotations and we were able to make this happen. Mr. Pahlavan requested at the beginning of his second attempt to be placed at a different site so there would not be bias working with people who knew his history. That request was granted . . . [and] he was put on a different service when at Hahnemann and was also sent to Einstein where he had not been previously. He did not request additional tutoring, mentoring, or practice sessions with me, however, he received additional guidance from multiple attendings and residents when they noted concern with his performance and offered personalized sessions to help him improve.

(Fitzpatrick Decl. ¶ 12.)

Dr. Fitzpatrick concluded that:

> In summary, Mr. Pahlavan failed to meet the standards required of a third year medical student in the Internal Medicine Clerkship, in large part due to his inability to apply critical clinical reasoning to the medical issues presented, and his inability to communicate in an organized, understandable manner.

(Def.'s SOF ¶ 20, Fitzpatrick Decl. ¶ 13.)

Plaintiff also appealed his Internal Medicine grade to Dr. Reynolds, Drexel's Chair of the Department of Medicine. (Def.'s SOF ¶ 5.) On April 1, 2014, Dr. Reynolds denied Plaintiff's appeal after considering Plaintiff's written submission, meeting with Plaintiff, and meeting and speaking with each of Plaintiff's faculty evaluators. (Id., Ex. 23.) Dr. Reynolds informed Plaintiff that "[a]fter careful evaluation of the available data reported by my colleagues in Medicine and hearing your comments, I am not able to identify any compelling reason to overturn the grades of unsatisfactory performance that you have received." (Ex. 23.)

Plaintiff notes that Dr. Reynolds did not consider his disabilities or accommodations while evaluating his appeal of the Internal Medicine grade.  (Pl.'s Resp. Br. 21; see also Ex. P-4, Dep. of James C. Reynolds, M.D. ("Reynolds Dep.") 33:4–19, ECF No. 98.)  In response, Drexel again appears to concede this point, claiming that Dr. Reynolds did not consider Plaintiff's disabilities or accommodations because Plaintiff did not mention either in his appeal letters.  (Def.'s Reply 8.)

Finally, Plaintiff appealed the Internal Medicine grade to Dr. Moran, the Vice Dean's designee.  (Def.'s SOF ¶ 5.)  Dr. Moran met with Plaintiff to discuss the appeal, Plaintiff's performance, and his Medicine clinical evaluations.  (Id.)  On April 11, 2014, Dr. Moran denied Plaintiff's appeal, noting that "[t]he evaluative comments related to organization, oral presentations, written work, interpretation of data, assessment . . . were very concerning and were very consistent among evaluators."  (Ex. 26, DUCOM-NP 0739.)  Dr Moran concluded, "[a]fter review of the file and careful consideration of our discussion, I cannot find a cogent reason to overturn the grade of 'Unsatisfactory' in the Medicine Clerkship."  (Id.)

As with Drs. Fitzpatrick and Reynolds, Plaintiff emphasizes that Dr. Moran also did not consider his disabilities or accommodations while evaluating his grade appeal.  (Pl.'s Resp. Br. 21; see also Ex. P-2, Dep. of Mary Moran, M.D. ("Moran Dep.") 32:9–34:7.)  Drexel again appears to concede this point, claiming that Dr. Moran did not consider Plaintiff's disabilities or accommodations because Plaintiff did not mention either in his appeal letters.[8]  (Def.'s Reply 8.)

---

[8]      Plaintiff also contends that Dr. Moran was improperly "pinch hitting" because she did not typically review these types of appeals and that she wasn't provided with information about Plaintiff's disabilities.  (Pl.'s Resp. to Def.'s SOF ¶ 21.)

**H. Plaintiff's Dismissal from the Program by the Clinical Promotions Committee and Plaintiff's Appeal**

As a result of Plaintiff's Unsatisfactory grades, Drexel's Clinical Promotions Committee met on April 11, 2014 to review Plaintiff's academic record. (Def.'s SOF ¶ 21.) During that meeting, the Committee upheld Plaintiff's failing grade in Internal Medicine and, on behalf of Drexel, decided to dismiss Plaintiff as a medical student based on his violation of his Conditional Enrollment Agreement. (Id.) This violation pertained to the Unsatisfactory grade in his Internal Medicine clinical and Marginal Unsatisfactory grade in his Obstetrics/Gynecology clinical. (Ex. 8 at 8k.) The Committee found that Plaintiff had failed to make meaningful progress in his clinical performance and that he would not be able to practice medicine independently in a competent manner. (Id.)

Plaintiff highlights that the Committee did not provide him with notice of the April 11, 2014 meeting and, thus, he was not present to respond to the Committee's decisions to uphold the failing Internal Medicine grade and dismissal. (Pl.'s Resp. to Def.'s SOF ¶ 5.) Plaintiff alleges that the Committee's process was "hurried." (Id. ¶ 21.)

Plaintiff submitted a written appeal in response to the Committee's dismissal. (Id. ¶ 7.) In his submission, Plaintiff did not address his disabilities or assert that Drexel failed in any way to adequately accommodate his disabilities.[9] (Id., Ex. 8 at 8l–8n.)

---

[9]     Plaintiff points out that Assistant Student Affairs Deans, Drs. Fuchs and Baranwal, guided him in drafting his appeal and that each dissuaded him from obtaining an attorney. (Id. ¶ 7.) In her deposition, Dr. Fuchs testified that she and Dr. Baranwal were available to assist students with general organization of their written appeals but did not direct students, including Plaintiff, regarding particular content of the appeal. (Fuchs Dep. 97:13–98:13, 100:12–18.) Dr. Fuchs did not recall talking with Plaintiff about seeking a lawyer during the appeal process. (Id. at 98:14–18.)

On May 9, 2014, Plaintiff appeared before the Clinical Promotions Committee and answered the Committee's questions relative to his appeal of the dismissal. (Def.'s SOF ¶ 7.) After reviewing Plaintiff's answers and written submission, the Committee, on behalf of Drexel, denied his appeal. (Id.)

Plaintiff next appealed his dismissal to Drexel's medical school Dean, Daniel Schidlow, M.D. (Id. ¶ 8.) In his submission, Plaintiff did not address his disabilities or allege that Drexel failed in any way to adequately accommodate his disabilities. (Id.) Dr. Schidlow met with Plaintiff and, upon consideration of Plaintiff's written appeal, submissions from his therapists, Drs. Gottlieb and Swirsky-Sacchetti, and his entire academic and professional record, Dr. Schidlow decided to uphold the decision of the Promotions Committee dismissing Plaintiff from Drexel's program. (Id. ¶ 8.) Dr. Schidlow stated that his decision was final and that no further appeal would be available. (Ex. 8 at 8w.)

In a document entitled "Memo to the File," Dr. Schidlow described his meeting with Plaintiff and concluded:

> The unanimous sense of the group was that Mr. Pahlavan has been given many opportunities to improve his performance; his record, in the aggregate, is very bad and casts serious doubt about his ability to successfully finish medical school and perform successfully as a physician.

> Based on the record, the interview and the opinion of the advisors, I am upholding the decision of the Promotions Committee of dismissal of [Plaintiff] from Drexel University College of Medicine [sic]

(Def.'s SOF ¶ 9, Ex. B, Dep. of Daniel Schidlow, M.D., Dep. Exs. 3 and 4.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a

reasonable factfinder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III. DISCUSSION AND LEGAL ANALYSIS

As noted previously, Plaintiff alleges that Drexel failed to accommodate his disabilities and illegally dismissed him from the medical school program because of his disabilities, in violation of Title III of the ADA, 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*

In relevant part, Title III of the ADA prohibits an entity that receives federal funding, such as Drexel, from discriminating against an individual on the basis of the individual's disability. 42 U.S.C. § 12182(a). Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The United States Court of Appeals for the Third Circuit has "explained that the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 275 (3d Cir. 2014) (internal quotation marks and citation omitted). To state a claim for failure to accommodate under Title III of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must allege that: "(1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability." CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 235 (3d Cir. 2013). The Third Circuit has reasoned that "the absence of the phrase 'qualified individual' from Title III [of the ADA], which appears in Title I, Title II, and the Rehabilitation Act. . . . make[s] little difference in a case . . . where the plaintiff seeks reasonable accommodation [because] . . . if more

than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." Menkowitz v. Pottstown Mem'l Med. Ctr., 154 F.3d 113, 121 (3d Cir. 1998) (quoting Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 154 (1st Cir. 1998)).

The parties do not dispute that Plaintiff has satisfied the first requirement of the ADA in that he suffers from ADHD, a disability which qualifies him for protection under these statutes.[10] Nor does Plaintiff dispute that he needed reasonable accommodations to complete Drexel's medical school program. (Pl.'s Resp. Br. 2 ("[Plaintiff] needed accommodations to succeed.").) Rather, Drexel contends that there are insufficient facts to prove that he was otherwise qualified, with or without reasonable accommodations, to meet all of the requirements of Drexel's medical school program. Drexel further argues that I should defer to its academic judgment regarding Plaintiff's qualifications. Plaintiff responds that there are disputed facts of record demonstrating that he was otherwise qualified to complete the program and that deference to Drexel is not warranted based upon the school's failure to demonstrate an exercise of professional judgment.

Thus, the primary issue before me is whether, with reasonable accommodations, Plaintiff was qualified to meet the academic standards of the medical school program. To answer this question, I must engage in a three-step inquiry. As a primary matter, I must determine the appropriate time period in which the alleged discriminatory decision was made. Next, I must consider whether I am compelled, as a matter of law, to defer to Drexel's assessment of whether Plaintiff was "otherwise qualified." Finally, if I find that no deference is warranted, I must engage

---

[10] Plaintiff has other disabilities that are cognizable under the ADA. (Hr'g Tr. 10–11.) The record includes references to General Anxiety Disorder, executive functioning impairment, and a potential diagnosis of a Reading Disorder. (Pl.'s SOF ¶ 9; Ex. 12 at DUCOM-NP 0207.)

in a *de novo* review of whether Plaintiff was "otherwise qualified" under the ADA and Rehabilitation Act.

### A. <u>Relevant Time Period for the ADA Analysis</u>

Temporally, a court's determination of whether a person is a qualified individual with a disability for the purposes of an ADA claim must be made by focusing on the relevant timeframe in which the alleged discriminatory decision was made. <u>Bowers v. Nat'l Collegiate Athletic Ass'n</u>, 475 F.3d 524, 536–37 (3d Cir. 2007), <u>amended on reh'g</u> (Mar. 8, 2007) (holding that the allegedly discriminatory conduct occurred over the course of a semester of school).

Here, Plaintiff seems to argue that the alleged discriminatory conduct persisted during his entire tenure at Drexel, beginning in AY 2008–2009 and continuing through AY 2013–2014. I disagree and conclude that my analysis should primarily focus on AY 2013–2014. This was the time period when Drexel decided to uphold Plaintiff's failing Internal Medicine clinical grade, which, along with Plaintiff's failing grade in his Obstetrics/Gynecology clinical, were the primary factors in Drexel's dismissal decision. During this time period, Plaintiff had returned to Drexel after a year-long leave of absence, resumed his clinical rotations, failed his Internal Medicine clinical, unsuccessfully appealed that grade, failed his Obstetrics/Gynecology clinical, was dismissed from the school, unsuccessfully appealed his dismissal, and was finally dismissed from the program.

### B. <u>Deference to Drexel's Decision of Dismissal</u>

The second part of my analysis is whether Drexel's assessment of "otherwise qualified" is entitled to deference. While courts maintain the "ultimate responsibility to determine whether a student is qualified with or without reasonable accommodations," great deference must also be applied by taking into consideration the faculty's professional judgment. <u>Chin v. Rutgers</u>, No. 14-

1332, 2016 WL 2653908, at *6 (D.N.J. May 9, 2016), aff'd, 697 F. App'x 754 (3d Cir. 2017) (unpublished) (citing Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)). In Chin, the Third Circuit directed that, when determining whether to defer to an academic institution's judgment as to a student's qualifications for a program, courts must assess, first, "did 'the academic institution seek suitable means of reasonably accommodating' the disabled student and submit a factual record of undertaking that obligation conscientiously, and second, did that process lead the university to reach a 'rationally justifiable conclusion.'" Chin, 697 F. App'x at 754 (quoting Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 25–26 (1st Cir. 1991) (en banc)). For example, deference to the university's judgment about the student's qualifications is warranted where the university submits a factual record showing that it had facilitated nearly all of the student's requested accommodation and dismissed the student only after a thorough consideration of the student's disability and accommodations. Zukle v. Regents of Univ. of Calif., 166 F.3d 1041, 1044 (9th Cir. 1999).

This deference, however, is not absolute. Wong v. Regents of Univ. of Calif., 192 F.3d 807, 817 (9th Cir. 1999). Deference is not warranted when the factual record reflects that the university did not "conscientiously consider[] all pertinent and appropriate information in making its decision." Wong, 192 F.3d at 819–20, 823. In Wong, the Ninth Circuit held that a medical school was not entitled to deference for its decision in denying accommodations for the plaintiff student and eventually dismissing him from the program. Id. The court reasoned that the school's officials failed to explore the efficacy of the student's proposed accommodations with any relevant professionals knowledgeable of the student's learning disability to determine whether the proposed accommodations could be implemented without fundamentally altering the program. Id. at 818–20. The Ninth Circuit rejected the university's purported reasoning for denying the proposed

accommodations as an "after-the-fact justification" that failed to exhibit the requisite conscientiousness. Id. at 819. Because the court determined that no deference was owed to the university's determination to dismiss the student, the court then reviewed *de novo* the student's proposed accommodations and qualifications. Id. at 819–20.

Applying these standards, and for purposes of evaluating Drexel's summary judgment motion, I must consider the entirety of the record before me. In doing so, I find that a genuine issue of material fact remains as to whether the relevant persons from Drexel involved in Plaintiff's 2014 appeal of his Internal Medicine grade—a primary reason for his dismissal—conscientiously considered all appropriate information in upholding that grade.

As noted above, Plaintiff's 2014 appeal of his failing grade in Internal Medicine proceeded through Drs. Fitzpatrick, Reynolds, and Moran. On one hand, Dr. Fitzpatrick's declaration reflects that Plaintiff's disabilities were considered. Dr. Fitzpatrick's declaration indicates that she was "aware that Mr. Pahlavan claims that he requested various types of help while on the Internal Medicine rotations and did not receive it." (Fitzpatrick Decl. ¶ 12.) The declaration acknowledges that Drexel granted Plaintiff's request to be placed in the Philadelphia area for rotations and that multiple attending physicians and residents provided Plaintiff with additional guidance and offered personalized sessions to help him improve his clinical performance. (Id.)

On the other hand, Drexel appears to concede that Dr. Fitzpatrick did not consider Plaintiff's disabilities. Drexel's reply brief seems to acknowledge that Dr. Fitzpatrick did not consider these issues because, as Drexel puts it, "[Plaintiff] *did not even mention* his disability or the accommodations . . ." in his appeal letters. (Def.'s Reply 8 (emphasis in original).)

Moreover, a factfinder could also conclude that the two other faculty members that reviewed Plaintiff's Internal Medicine grade appeal, Drs. Reynolds and Moran, did not consider

Plaintiff's disabilities or accommodations while evaluating his appeal. Drexel appears to concede this point. In response to Plaintiff's argument that neither Dr. Reynolds nor Dr. Moran considered Plaintiff's disabilities or accommodations, Drexel states that they did not consider these issues because Plaintiff did not mention them in his appeal letters. (Def.'s Reply 8. ("Mr. Pahlavan neglects to mention that in each instance he wrote appeal letters [to Drs. Reynolds, and Moran] focusing on various and sundry issues *but did not even mention* his disability or the accommodations he received or did not receive. . . . [Drexel]'s faculty cannot be held responsible for considering in internal appeals only the issues that Mr. Pahlavan actually raised.") (emphasis in original).)

Thus, at a minimum, two of the three faculty reviewers involved in the 2014 appeal of his Internal Medicine clinical grade arguably did not consider Plaintiff's disabilities or accommodations when deciding whether to uphold his failing grade. This grade served as a catalyst—in conjunction with his failing grade in the Obstetrics/Gynecology clinical—for Plaintiff's dismissal. Thereafter, the Clinical Promotions Committee met, upheld the failing Internal Medicine grade, and, on behalf of Drexel, dismissed Plaintiff from the program for failing two clinical rotations, in violation of his Conditional Enrollment Agreement. The record is also devoid of any indication that the Clinical Promotions Committee conscientiously considered Plaintiff's disabilities or accommodations at this hearing on Plaintiff's grade and in its decision to dismiss him.

Thereafter, Plaintiff appealed his dismissal and appeared before the Clinical Promotions Committee to discuss his appeal and answer questions. The record is also devoid of any indication that, at this hearing on Plaintiff's appeal of his dismissal, the Clinical Promotions Committee conscientiously considered Plaintiff's disabilities or accommodations.

The final phase of Plaintiff's appeal was before Drexel's Dean, Dr. Schidlow. Here, the record does reflect that Dr. Schidlow considered Plaintiff's disabilities and accommodations. Dr. Schidlow met with Plaintiff and, upon consideration of Plaintiff's written appeal, submissions from his therapists, and his entire academic and professional record, decided to uphold the decision of the Promotions Committee.

Despite Dr. Schidlow's consideration of Plaintiff's disabilities, the remaining record is simply too inconsistent to conclude that there are no disputed facts and to afford Drexel deference as a matter of law. As noted above, it is unclear whether Drs. Reynolds and Moran and the Clinical Promotions Committee considered Plaintiff's disabilities and accommodations during Plaintiff's 2014 appeal of his Internal Medicine grade. It is also unclear whether the Clinical Promotions Committee also failed to do the same during Plaintiff's appeal of his dismissal.

Thus, I decline to defer to Drexel's decision to dismiss Plaintiff and will engage in a *de novo* review of Plaintiff's dismissal from the program.

### C. *De Novo* Review of the Americans with Disabilities Act and Rehabilitation Act

Having found that Drexel is not entitled to deference as a matter of law, I now engage in a *de novo* review of whether Plaintiff was "otherwise qualified" under the ADA and Rehabilitation Act, *i.e.*, whether Plaintiff can establish that reasonable accommodations existed that would have permitted him to meet the medical school program's requirements.

"An otherwise qualified individual is a person who can meet all of a program's requirements in spite of a disability, with or without reasonable accommodation." Millington v. Temple Univ. Sch. of Dentistry, 261 F. App'x 363, 366 (3d Cir. 2008) (unpublished) (citing Southeastern Comm. Coll. v. Davis, 442 U.S. 397, 406 (1979) and McDonald v. Pennsylvania, 62 F.3d 92, 96 (3d Cir. 1995)). In the post-secondary education setting, "otherwise qualified" has

been framed as whether the student plaintiff was "capable of completing the [s]chool's requirements" or "qualified to graduate from [the school]." Chin, 2016 WL 2653908, at *6. This requirement has also been described as whether the plaintiff was otherwise qualified "to continue at the school," "complete the program requirements," or was "otherwise qualified for retention in the [post-secondary education] program." Chin, 697 F. App'x at 755; McGregor v. Louisiana State Univ. Bd. of Sup'rs, 3 F.3d 850, 854 (5th Cir. 1993). In the medical school setting, a plaintiff bears the burden of proving that a reasonable accommodation existed that would enable him to meet the medical school program's academic requirements. Chin, 697 F. App'x at 755.

In McGregor v. Louisiana State University Board of Supervisors, the Fifth Circuit explained that there is a difference between being otherwise qualified for admission and qualified for retention. McGregor, 3 F.3d at 854. The court noted that many students, handicapped or not, who qualify for admission, are not qualified for retention because they cannot maintain the minimum grades required by the university. Id. The McGregor court affirmed summary judgment in favor of a post-secondary education program where the student, despite being provided reasonable accommodations, was not otherwise qualified because he did not achieve the minimum grades required for retention, as mandated by the program's academic standards. Id. at 860.

If the plaintiff meets his burden of establishing that he or she was otherwise qualified, the burden then shifts to the defendant to show that the plaintiff's "requested accommodation would fundamentally alter the nature of the school's program." Millington, 261 F. App'x at 367.

The ADA does not require an academic institution to provide accommodations if such accommodations would fundamentally alter the nature of the program or would constitute an undue hardship on the school. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 280 (3d Cir. 2012) ("To offer an 'appropriate' education under the Rehabilitation Act [and ADA], a school [] must

reasonably accommodate the needs of a the [disabled student] . . . [h]owever, [neither statute] []
mandate[s] 'substantial' changes to the school's programs."); Zukle, 166 F.3d at 1047–48. The
ADA also does not require an institution to provide all of the accommodations that that an
individual requests. McElwee v. Cty. of Orange, 700 F.3d 635, 641 (2d Cir. 2012) ("Although a
public entity must make reasonable accommodations, it does not have to provide a disabled
individual with every accommodation he requests or the accommodation of his choice." (internal
quotations omitted)).

Applying these standards, my review of the record reveals no question of material fact
remains and that Plaintiff was unable to meet Drexel's academic requirements, even with the
accommodations that Drexel provided.

Drexel's Medical Student Handbook outlines the program's requirements and articulates
that all students, including Plaintiff, must successfully complete all required clinical rotations. The
Handbook advises that students may be dismissed from the program if they repeatedly earn grades
of Marginal Unsatisfactory and/or Unsatisfactory in one or more clinicals. Further, Drexel's
Technical Standards define the fundamental attributes that a medical degree candidate must
possess, such that the student "must be able to measure, calculate, reason, analyze, integrate and
synthesize . . . [and] must be able to perform these problem-solving skills in a timely fashion."
(Def.'s SOF ¶ 3.)

In an effort to assist Plaintiff in meeting these standards, Drexel provided him with
numerous accommodations, including: extended time on examinations, a reversal of the 2012
dismissal decision, a tutor for notetaking and presenting during clinicals, a one-year leave of
absence, the opportunity to complete the clinical rotation with continued intensive counseling, a
one-on-one clinical refresher course, a one-on-one mentor during clinicals, therapy with

psychiatrist Dr. Gottlieb from 2009–2014, neuropsychological testing and additional therapy with psychologist Dr. Swirsky-Sacchetti, and placement of his third-year clinicals in Philadelphia medical facilities so that Plaintiff could remain in the Philadelphia area and continue with psychiatric and psychological therapies.

Despite the myriad of accommodations that he was afforded, Plaintiff repeatedly failed his clinicals and was unable to meet the medical school's standards and skills. When Plaintiff was given a second chance and resumed his education in AY 2013–2014 after a leave of absence, he was notified that, pursuant to his Conditional Enrollment Agreement, any subsequent grade in a rotation of Marginal Unsatisfactory or Unsatisfactory would be grounds for dismissal. He received an Unsatisfactory grade in his Internal Medicine rotation. While appealing this grade, he also received a Marginal Unsatisfactory grade in Obstetrics/Gynecology. Thus, the record before me establishes that, even with accommodations that were in place, there is no factual dispute that Plaintiff was unable to meet the medical school program's requirements and was, thus, not otherwise qualified.

In his opposition to Drexel's motion for summary judgment, Plaintiff spends little time criticizing the myriad of accommodations that Drexel provided during his clinical rotations in AY 2013–2014. Rather, in an attempt to meet his burden and to create a genuine issue of material fact on this issue, Plaintiff makes two arguments. First, he contends that certain additional accommodations would have allowed him to meet Drexel's program requirements. Second, Plaintiff asserts that Drexel somehow "conceded" that Plaintiff was otherwise qualified. I address each argument individually.

### 1. Reasonable Accommodations that Plaintiff Alleges Would Have Enabled Him to Meet Drexel's Program Requirements

Plaintiff, through his expert Dr. Meeks, cites to six accommodations that should have been provided and would have enabled him to meet the program's requirements. During the relevant timeframe of Plaintiff's third- and fourth-year clinicals, Dr. Meeks opines that Drexel:

> (1) Failed to engage in a meaningful and interactive process regarding accommodations in the clinical setting; (2) Denied Mr. Pahlavan's request to rotate in the same hospital; (3) Failed to offer an alternative accommodation solution for the functional limitations that led to the aforementioned request to rotate in the same hospital; (4) Failed to provide a system for formally requesting accommodations during the clinical years; (5) Failed to train faculty and staff in the provision of accommodations or the process of requesting accommodations in the clinical setting; and (6) Failed to follow LCME standard 12.4 *Student Access to Health Care Services*.

(Ex. M, "Expert Witness Report" by Dr. Lisa Meeks, Ph.D. ("Meeks Report") 5.)[11]

As explained below, I find, as a matter of law, that even if Dr. Meeks's suggested accommodations would have been implemented, these proposed additional accommodations would not have enabled Plaintiff to meet the medical school's academic and program requirements.

At the outset, I note that Dr. Meeks fails to establish that Plaintiff would have succeeded in meeting the program's academic requirements with her six additional accommodations. In fact, Dr. Meeks concedes that that she is unable to predict how Plaintiff would have performed during

---

[11]     Dr. Meeks also claims that Drexel did not fully accommodate Plaintiff during the first two academic years of the program by failing to provide notetaking assistance. (Meeks Report 5.) This argument is immaterial because this proposed accommodation temporally falls within Plaintiff's didactic years of the program in AY 2008–2010, which is outside of the relevant time period, particularly the third-year clinical portion of the program in AY 2013–2014. Dr. Meeks is also unable to forecast the efficacy of this accommodation, acknowledging that it was "impossible to determine whether or not having this accommodation in place would have improved [Plaintiff]'s academic experience. . . . [and that] we cannot predict what 'would have' occurred had [Plaintiff] been properly accommodated in the didactic years." (Meeks Report 7, 14.)

his clinicals, even if Drexel had granted all of Plaintiff's accommodation requests. At her deposition, Dr. Meeks acknowledged that making a prediction about Plaintiff's success in medical school, if Drexel had provided other accommodations, would be unprofessional:

> Q. And is it your testimony that if Drexel had given [Plaintiff] the accommodations that he requested fully that he would have been successful in graduating from medical school?
>
> A. It would be unprofessional for me to make assumptions about whether or not somebody is going to succeed. There are so many other confounding variables that could influence that. . . . [T]here were accommodations that were not approved that almost certainly contributed to the lack of success that he experienced.
>
> Q. But it's fair to say that you could not opine that if those accommodations were approved that he would, in fact, have been successful because as to just testified of all the other variables that go into whether he could be successful or not, correct?
>
> A. Correct. I can't predict what happens with any student, not can anyone else.

(Ex. O, Dep. of Lisa Meeks, Ph.D. ("Meeks Dep.") 59:19–60:18.)

Where a plaintiff or his expert are unable to forecast the likelihood of success with an additional accommodation in place, the proposed accommodation is unreasonable and fails to support that a student is otherwise qualified. Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 466 (4th Cir. 2012). In Halpern, the Fourth Circuit affirmed a grant of summary judgment in favor of a medical school where the plaintiff, a disabled student who had been dismissed from the program, was unable to forecast—even with the attempted support of an expert witness—when, if ever, the requested accommodations would have enabled the student to meet the schools' program requirements. Id. The same situation exists here. Dr. Meeks fails to forecast, with any certainty, Plaintiff's success in the medical school program, had Drexel provided him with other accommodations.

Even if Dr. Meeks did opine that her suggested additional accommodations would have allowed Plaintiff to complete the program, a careful examination of the six accommodations cited

by Dr. Meeks reflects that Plaintiff has still failed to create a genuine issue of material fact regarding his ability to complete the program.

Regarding Dr. Meeks's first and fourth alleged deficiencies, she claims that Drexel "[f]ailed to engage in a meaningful and interactive process regarding accommodations in the clinical setting [and] [f]ailed to provide a system for formally requesting accommodations during the clinical years." (Meeks Report 5 ¶¶ 1, 4.) Drexel acknowledges that there may be a factual dispute "[a]s to whether [Drexel] had an obligation to institute an interactive process, whether [Plaintiff] asked for particular accommodations in the clinical portion." (Hr'g Tr. 28–29.) But, Drexel properly contends that summary judgment is still warranted because Plaintiff has not established that these deficiencies are material such that, if provided, they would have enabled Plaintiff to successfully meet the program's academic standards.

And, Plaintiff's claimed deficiencies in Drexel's communication system for requesting accommodations are belied by the overwhelming, undisputed record that reflects that Plaintiff constantly requested and Drexel consistently responded to and provided a myriad of accommodations, both through the school's ODR and through the medical school. These accommodation requests granted by Drexel included the ability to rotate in Philadelphia area hospitals to facilitate his continued therapy, continued therapy with Drs. Gottlieb and Swirsky-Sacchetti, a one-on-one tutor for help with presenting and note-taking, and a one-on-one clinical refresher course. Additionally, prior to beginning his repeated third-year clinicals, Drexel's Dean, Dr. Fuchs joined a call with Plaintiff's psychologist and psychiatrist to address Plaintiff's disabilities and to identify accommodations for Plaintiff during his clinicals. Drexel followed up the call by implementing the aforementioned accommodations. In short, Plaintiff is unable to point to any facts reflecting that Drexel's communication system with Plaintiff was deficient.

31

Relatedly, in her fifth alleged deficiency, Dr. Meeks complains that Drexel "[f]ailed to train faculty and staff in the provision of accommodations or the process of requesting accommodations in the clinical setting." (Meeks Report 5 ¶ 5.) Beyond articulating this deficiency, neither Dr. Meeks's reports nor Plaintiff's briefing provides any further explanation, citation, or support for this assertion. While I am obligated to resolve all doubts regarding material facts in favor of the non-moving party, bare assertions and conclusory allegations cannot create genuine issues of material fact. Schaar, 732 F. Supp. 2d at 493; Petrucelli v. Bohringer, No. 91–2098, 1994 WL 81999, at *4 (E.D. Pa. Mar. 10, 1994) (reasoning that to defeat summary judgment, the non-moving party may not rest upon "the vague and amorphous argument that the record somewhere contains facts sufficient to support its claims . . . nor by substituting conclusory allegations in a complaint with the conclusory allegations of an affidavit or even expert report").

In her second and third alleged deficiencies, Dr. Meeks opines that Drexel did not fully accommodate Plaintiff because it "[d]enied Mr. Pahlavan's request to rotate in the same hospital [and] [f]ailed to offer an alternative accommodation solution for the functional limitations that led to the aforementioned request to rotate in the same hospital." (Meeks Report 5 ¶¶ 2, 3.) At his deposition, Plaintiff testified that he made the request for his rotations to occur either *in the same area* or in the same hospital, but he did not recall how or when he lodged the request. (Pahlavan Dep. 202:24–205:22.) Dr. Meeks also cites to an unsigned, handwritten note within the ODR file, dated June 19, 2013, which states "Placements in Philly, not going to be necessarily be in same [sic] hospital. Not reasonable." (Meeks Report 8 (citing Ex. 12 at DUCOM-NP 0154).) Dr. Meeks's report goes on to state that "[a]ccording to Mr. Pahlavan[,] no alternative accommodation was offered to address his request, nor was any iteration of his request considered. . . " (Meeks Report 9.)

While the record is somewhat mixed as to whether Plaintiff's request to rotate within one hospital was considered by Drexel, it remains undisputed that Plaintiff was granted the accommodation to conduct his clinical rotations in Philadelphia-area hospitals so that he could continue therapy with Drs. Gottlieb and Swirsky-Sacchetti. (Pahlavan Dep. 229:16–230:17.) And, in any event, Plaintiff has not pointed to any facts which could establish that being allowed to repeat his clinical rotations "in the same hospital" would have allowed him to complete Drexel's medical school program. Indeed, Dr. Meeks acknowledged her inability to predict how any other accommodation, including rotating in the same hospital, would have affected Plaintiff's performance. (Meeks Dep. at 59:19–60:18.)

Dr. Meeks's final claim is that Drexel "[f]ailed to follow LCME[12] standard 12.4 *Student Access to Health Care Services*." (Meeks Report 5 ¶ 6.) Dr. Meeks opines that Drexel failed to abide by the medical school accrediting organization's standards of providing students with access to health care services. She states that, while Drexel's administrators would encourage Plaintiff to attend his therapy sessions with Drs. Gottlieb and Swirkshy-Sacchetti, Drexel staff also provided "mixed messages about whether or not leaving clinic[als] was supported likely increased [Plaintiff's] anxiety. . ." (Meeks Report 12.)

But again, Plaintiff fails to identify any fact of record that could establish Plaintiff's future success had the LCME been more closely followed. Additionally, there is nothing in the record before me establishing that Drexel agreed to be bound by the LCME standards. Bain v. Howard

---

[12] LCME stands for the Liaison Committee on Medical Education, which is an organization that provides accreditation to medical education programs. LCME standard 12.4 states that a medical school must demonstrate that it "provides its medical students with timely access to needed diagnostic, preventive, and therapeutic health services at sites in reasonable proximity to the locations of their required educational experiences and has policies and procedures in place that permit students to be excused from these experiences to seek needed care."

Univ., 968 F. Supp. 2d 294, 300 (D.D.C. 2013), aff'd sub nom. Bain v. Howard Univ., Inc., No. 13-7174, 2014 WL 1378308 (D.C. Cir. Mar. 25, 2014) (entering summary in favor of a medical school where the dismissed student failed to show that the medical school adopted the LCME standards, yet the student "tried to hold [the medical school] to LCME standards, none of which bears on the question of whether [the medical school] could dismiss a student who repeatedly failed the examinations associated with his [clinicals]."). Therefore, I find that Plaintiff's allegation as to the LCME standards fails to create a material issue of fact.

It is worth repeating that Drexel provided Plaintiff with access to therapists and placed Plaintiff's repeated third-year clinicals in Philadelphia hospitals to facilitate his proximity to his therapists. Plaintiff's vague assertion relative to how Drexel should have acted differently, and in compliance with the LCME standard, cannot create a genuine issue of fact.

In sum, in light of the plethora of accommodations provided to Plaintiff and given the lack of any evidence that Dr. Meeks's suggestions for additional accommodations would have made a difference, I conclude as a matter of law that Plaintiff has failed to create a genuine issue of material fact that, with any other accommodations, he would have been able to meet the program's requirements.[13]

### 2. Drexel Did Not "Concede" that Plaintiff is Otherwise Qualified

Alternatively, Plaintiff asserts that Drexel somehow "conceded" that he was otherwise qualified to meet the medical school program's requirements. In support, Plaintiff cherry-picks several documents, forms, letters, and reports, which allegedly establish that Drexel independently

---

[13] Because Dr. Meeks's report, declaration, and testimony do not support a basis for Plaintiff meeting his burden, I will not reach the merits of Drexel's "Motion *in Limine* to Limit the Testimony of Lisa Meeks, Ph.D. to Her Report." (ECF No. 80.)

concluded that he was otherwise qualified.  A careful examination of these documents belies Plaintiff's position.

For instance, Plaintiff cites to files from Drexel's ODR, including Plaintiff's accommodation request forms and Drexel's responsive letters.  According to Plaintiff, these documents establish that Drexel acknowledged Plaintiff's disabilities and determined that he was otherwise qualified, as defined by the ADA.

Drexel effectively points out that the staff members in the school's ODR, who provided Plaintiff with accommodations, never made the psychiatric, psychological, and academic determination that Mr. Pahlavan is an otherwise qualified person with disabilities who can succeed in the medical school program, with or without reasonable accommodations.  In fact, all of the records referenced by Plaintiff on this issue simply reflect that Plaintiff requested accommodations and that Drexel acknowledged Plaintiff's disabilities and provided him various forms of accommodations, both formally through the school's ODR and informally through the medical school and medical school staff.  (See, e.g., Ex. 12 at DUCOM-NP 185 (Drexel staff acknowledging Plaintiff's disabilities of ADHD and a Reading Disorder) and id. at DUCOM-NP 0188 (Accommodation Verification Letter showing that for his Fall 2013 semester, Plaintiff was granted extended time on tests, books on CDs, PDFs in accessible formats, and third-year clerkships to be scheduled in the Philadelphia area).)

Plaintiff also references letters and testimony of Dr. Gottlieb, the psychiatrist who treated Plaintiff from 2009 through 2014 throughout his medical school years.  In her June 9, 2010 letter, Dr. Gottlieb stated that, with consistent effort and reasonable accommodations, Plaintiff had the ability to succeed in medical school.  (Gottlieb Dep. 158–160, Dep. Ex. G-2.)  But, this letter was sent nearly two years *before* Plaintiff was granted and began his year-long leave of absence for

AY 2012–2013. Moreover, the letter was submitted at least three years prior to the relevant timeframe, which I have determined to be Plaintiff's AY 2013–2014. In fact, as part of Plaintiff's 2014 appeal of his final dismissal from Drexel's program, Dr. Gottlieb submitted yet another letter to Drexel's Dean Schidlow, which notably omits any statement that Plaintiff would be able to succeed in the medical school program with any type of accommodation. (Ex. 8 at 8t.)

Plaintiff next points to the following excerpt from Dr. Gottlieb's deposition: "Q. And at the time you wrote this letter, June 10th, 2014, your belief was that [Plaintiff] should be allowed to complete medical school? . . . A. Yes." (Gottlieb Dep. 181:15–22.) This singular response by Dr. Gottlieb does not address the central issue in this case—whether Plaintiff can articulate reasonable accommodations that would have enabled him to meet the all of the requirements of Drexel's medical school program. In fact, Dr. Gottlieb testified that she could not think of any additional accommodations that would have helped Plaintiff succeed in medical school. (Gottlieb Dep. 65:16–23 ("Q. Were there any accommodations that you felt, as his treating psychiatrist, the school could have given him, that did not give him, that would have enabled him to succeed at medical school? A. I can't think of anything else I would have suggested.")). Dr. Gottlieb also testified that she "had doubts as to whether [Plaintiff] could be successful completing medical school irregardless [sic] of how much support he got, and certainly it wouldn't happen without him making great changes in his behavior." (Id. at 181:9–14.)

Plaintiff also references a June or July 2013 call that occurred prior to his return to Drexel's program after his one-year leave of absence, between Dr. Fuchs, who was Drexel's Senior Associate for Student Affairs, and Drs. Gottlieb and Swirsky-Sacchetti. (Hr'g Tr. 36; Pl.'s Resp. to Def.'s SOF ¶ 30.) The purpose of the call was to notify Dr. Fuchs of the accommodations that Dr. Swirsky-Sacchetti was recommending to help Plaintiff "prepare for and be on" his third- and

fourth-year clinical rotations. (Gottlieb Dep. 146:22–147:7.) These accommodations included a template for presenting and a one-on-one mentor. (Id. at 146:4–147:7.) Plaintiff argues that this call establishes that Drexel was put on notice of Plaintiff's disabilities and need for accommodations during his clinicals. However, Dr. Gottlieb testified that these accommodations had already been provided to Plaintiff through a fourth-year medical student mentor, and, in any event, Plaintiff failed his first attempt at his clinicals with these accommodations in place. (Gottlieb Dep. 149:7–151:7.)

Plaintiff next points to Dr. Swirsky-Sacchetti's neuropsychological evaluation in Drexel's ODR files. Dr. Swirsky-Sacchetti's neuropsychological evaluation was completed in 2011–2012 to analyze Plaintiff's organizational and comprehension issues and to provide recommendations that may aid in his ability to remain in the medical school. This evaluation was completed before Plaintiff returned to school in the Fall of 2013, and, thus, before the relevant timeframe for the current analysis, particularly in AY 2013–2014.

Finally, Plaintiff cites to a letter, dated June 11, 2014, sent by Dr. Swirsky-Sacchetti to Drexel's Dean Schidlow in support of Plaintiff's continued tenure at the school. (Ex. 8 at 8u–8v; Hr'g Tr. 20–21.) In this letter, Dr. Swirsky-Sacchetti acknowledged that Plaintiff was:



(Ex. 8 at 8u–8v.)

Dr. Swirsky-Sacchetti's prediction is undermined by his deposition testimony and by other facts of record. At his deposition, Dr. Swirsky-Sacchetti conceded that his suggested accommodations, namely, continued therapy with himself and Dr. Gottlieb, had already been provided to and utilized by Plaintiff. (Swirsky-Sacchetti Dep. 66–68.) And, it remains undisputed that even with these supports in place, Plaintiff still failed certain clinical rotations. Dr. Swirsky-Sacchetti also acknowledged that the Deans at Drexel, who are physicians and are involved in medical education, would have a better understanding than he did about what skills and competencies a medical student needs to be successful. (Id. at 68:3–11.)

In sum, I find that the evidence of record, taken in the light most favorable to Plaintiff, does not establish that Drexel "conceded" that he was otherwise qualified.

### 3. Conclusion as to "Otherwise Qualified"

In light of the record before me, Plaintiff has not met his burden of establishing that any material issue of fact remains as to whether he was otherwise qualified to meet the medical school program's requirements. Because I find that Plaintiff has failed to identify any disputed material fact as to one of the necessary elements of his *prima facie* case, I will grant Drexel's Motion for Summary Judgment.[14]

---

[14]     Plaintiff provided supplemental citations (ECF No. 102) to support his argumnet that whether a Plaintiff is otherwise qualified is a question of fact. A careful review of these cases actually supports my conclusions. In one case, the Fifth Circuit affirmed summary judgment in favor of a post-secondary education program where the student, despite being provided reasonable accommodations, was not otherwise qualified because he failed to achieve the program's minimum grade point average. McGregor, 3 F.3d at 854, 860; see also Sandison v. Michigan High Sch. Athletic Ass'n, Inc., 64 F.3d 1026, 1028 (6th Cir. 1995) (concluding that the students are unlikely to succeed in pursuing their ADA or Rehabilitation Act claims, in part, because the plaintiffs are unlikely to succeed in showing that they are "qualified individuals"); see also Fedro v. Reno, 21 F.3d 1391, 1401 (7th Cir. 1994) (holding that the lower court erred in finding that the students were likely to show that they are otherwise qualified to participate in the program). The remainder

## D. **Supplemental Jurisdiction**

Having dismissed Plaintiff's federal causes of action, I must decide whether to exercise supplemental jurisdiction over the remaining state law claim for breach of contract. A district court may decline to extend supplemental jurisdiction over a state law claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Whether supplemental jurisdiction will be extended under these circumstances is discretionary. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009). Ordinarily, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). If a district court decides not to exercise supplemental jurisdiction, it should dismiss the state law claims without prejudice. Kach, 589 F.3d at 650.

Plaintiff's breach of contract claim is premised on Drexel's alleged violation of the Handbook, which articulates that Drexel prohibits discriminating against individuals on the basis of a disability. (Complaint ¶¶ 95–96, ECF No. 1.) Plaintiff alleges that Drexel breached its contract by discriminating against him based on his disabilities in failing to make reasonable accommodations and in dismissing him. (Id. ¶ 97.)

Neither party has briefed the breach of contract claim at this juncture, so I will not reach the merits of this claim. However, Plaintiff's breach of contract claim is inextricably tied to his

---

of cases cited by Plaintiff include genuine issues of material fact, which are not present here. See Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 833 (4th Cir. 1994); Griesinger v. Univ. of Cincinnati, No. 13-808, 2016 U.S. Dist. LEXIS 58931 (S.D. Ohio May 3, 2016); Axelrod v. Phillips Acad., 74 F. Supp. 2d 106, 109 (D. Mass. Nov. 18, 1999); Frankola v. Louisiana State Univ. Sch. of Med., No. 15-5933, 2017 WL 372520, at *4 (E.D. La. Jan. 26, 2017). Overall, these cases are distinguishable and do not compel a different outcome.

ADA and Rehabilitation Act claims. Because both of these claims are being dismissed, I find that the interests of judicial economy, convenience, fairness, and comity will not be served by extending supplemental jurisdiction over the remaining state law breach of contract claim. Therefore, I will decline to exercise supplemental jurisdiction. The state law claim will be dismissed without prejudice, so it may be re-filed in state court.

## IV.    CONCLUSION

For the foregoing reasons, I conclude that Drexel's Motion for Summary Judgment will be granted as to the Americans with Disabilities Act claim (Count One) and Rehabilitation Act claim (Count Two). Plaintiff's remaining breach of contract claim will be dismissed without prejudice.

An appropriate Order follows.